IN RE GUARDIANSHIP AND CONSERVATORSHIP OF
AMELIA HARTWIG, AN INCAPACITATED PERSON.
MICK HARTWIG, APPELLEE, V.
JOHN HARTWIG, APPELLANT.
656 N.W.2d 268

Filed January 14, 2003.    No. A-02-088.

Michael J. Javoronok, of Michael J. Javoronok Law Firm, for appellant.

Paul E. Hofmeister, of Chaloupka, Holyoke, Hofmeister, Snyder & Chaloupka, P.C., L.L.O., for appellee.

IRWIN, Chief Judge, and HANNON and CARLSON, Judges.

HANNON, Judge.

## INTRODUCTION

Amelia Hartwig's grandson, Mick Hartwig, filed a petition requesting that he be appointed guardian and conservator of Amelia's estate. John Hartwig, Amelia's attorney in fact and adult son, objected to the proceedings. The county court found that a guardian and conservator needed to be appointed for Amelia, and it appointed Mick. John appeals, alleging that there was not clear and convincing evidence that a guardian or conservator needed to be appointed for Amelia, since he was her attorney in fact, nor was there evidence that he had wasted or dissipated assets so as to warrant appointing a guardian or conservator and bypassing his priority for appointment. The evidence shows Amelia to have few assets, and her durable power of attorney gives John a broad grant of power such that the appointment of a conservator and a guardian is unnecessary. The evidence does not support a finding that John wasted or dissipated Amelia's assets, and we find that John is a suitable and proper person to continue acting as Amelia's attorney in fact. We therefore conclude that the evidence does not disclose the need for the county court's appointment of a guardian and conservator for Amelia. Accordingly, we reverse, and remand with direction to dismiss the proceedings.

## BACKGROUND

For most of their lives, Amelia and her husband lived together in their home in Scottsbluff, Nebraska. John, one of their sons, spent the majority of his days from around 1988 to January 1998 visiting and caring for his parents. Amelia and her husband had three other children: Larry Hartwig, Don Hartwig, and Caroline Hughes (Caroline). The evidence showed Caroline and John have a strained and tenuous relationship. Caroline lives in Arizona, but the other children, along with Mick, Larry's son, all reside in Scottsbluff.

In a durable power of attorney dated December 17, 1992, Amelia appointed John as her attorney in fact. The document gives John a broad grant of powers, including but not limited to the power to manage Amelia's affairs; to acquire and dispose of any real or personal property; to open, deposit into, withdraw from, and close any bank accounts; to collect, withdraw, and receive any moneys owing; to add or remove any contents of safe deposit boxes; to apply for and receive any government, insurance, and retirement benefits to which Amelia may be entitled; to employ professionals to render services for and to Amelia and to pay the reasonable fees and compensation of such persons for their services; to give consent for medical treatment to be performed; and to prepare, sign, and file tax returns of all kinds and claims for refunds.

The durable power of attorney contains a clause that states: "If it becomes necessary to appoint a Conservator of my Estate or Guardian of my person, I nominate the following: JOHN E. HARTWIG." The power of attorney stated that it could only be revoked by (1) the execution by Amelia of a subsequent durable power of attorney, (2) the recordation of her express written revocation, or (3) the lawful revocation by the conservator of her estate. Another clause states that the power shall not be affected by Amelia's disability or incapacity and that the power may be accepted and relied upon by anyone to whom it is presented until that person receives written notice of revocation by Amelia or a conservator of her estate or until that person has actual knowledge of Amelia's death. There is no evidence that Amelia revoked this power of attorney.

On December 3, 1997, Amelia and her husband conveyed their home to John, subject to a joint life estate in the grantors, via a quitclaim deed for $1 "and other good and valuable consideration." John recorded the deed on December 5. At the time of trial, the value of the house was $45,000 to $50,000. Amelia continued living in the home until January 23, 1998, and her husband lived in it until June 2, 2000. Since June 2000, no one has occupied the home, and no one has asserted that the house should be rented. The evidence suggested that the personal property of Amelia and her late husband remained in the house, since John testified that he did not distribute any of his father's personal property, and when asked if such property was still in the house, John testified, "Everything is the same as always." John has continued to pay utilities on the residence from Amelia's accounts.

Amelia was placed in the Heritage Health Care Center (Heritage) in Gering, Nebraska, in 1998, because according to John, her doctor said that John "was unable to take care of her because every time she fell, she broke a bone and she would have to go to a nursing home to recuperate." Her husband was moved into Heritage on June 2, 2000, and he died on February 22, 2001. Virginia Nolan, director of nursing at Heritage, testified that she saw Amelia a minimum of four times a week and that Amelia's medical needs were being cared for. Carol Hintergardt, Heritage's administrator, said that all of Amelia's financial matters with regard to Heritage have been adequately cared for by John since January 1998. Heritage is paid $386 a month from Amelia's account.

Amelia's checking account statement from First National Bank for a period ending October 12, 2001, showed that she had an ending balance of $4,503.26. Amelia regularly received $436 per month from Social Security and a small amount of interest which, on the October 12 statement, was $3.49. Amelia's U.S. Bank statement on her "Interest Checking" account for the period ending September 27, 2001, showed a balance of $3,064.12, and $1.56 of that amount represented interest paid. The house was Amelia's only asset other than this money in bank accounts.

On or about August 15, 2001, Mick submitted a verified petition in the county court for Scotts Bluff County, alleging that 93-year-old Amelia was incapacitated due to advanced age and senility, and he requested to have a guardian and conservator appointed for Amelia. The petition stated that no steps had been taken to find less restrictive alternatives and that John "may hold a Power of Attorney." John contested the action.

A hearing was held on November 8, 2001. John testified that he would be 70 years old in December and that he visited Amelia at Heritage daily. Workers at Heritage testified that they frequently saw John visiting Amelia but that they did not know Mick. Mick is a 33-year-old teacher and coach for Gering Junior High. Mick testified that prior to the time Amelia went to Heritage, he saw her on average once or twice a week. For the current calendar year, he had visited her for 10 to 15 minutes four or five times. He guessed that he saw her five or six times in each of the years 1998, 1999, and 2000.

Mick testified that the problem with John is that John is noncommunicative about issues. Mick said that as a grandchild of Amelia, he is "really not involved directly" in her affairs and that he tries "to let the adults deal with it." Mick testified that he was willing to manage Amelia's assets and pay her bills. Caroline testified that her relationship with John had been distant since the summer of 1994, when she came home to visit her parents and John tried to throw her out of the house. Caroline testified that John had been very cruel and abusive toward her. She believed that Mick should be the guardian because he "would not use the funds to pay the utilities on a house that does not belong to [Amelia]." Caroline further testified that Mick is a loving grandchild, that he visits Amelia, and that he would take care of her needs immediately. Caroline's daughter, Deborah Cruze (Deborah), favored Mick's being the guardian because "we needed to have someone in the family who was able to obtain medical information and share that with everyone else so that appropriate decisions could be made and that had not been happening with my Uncle John." Deborah further testified that she "was concerned that the assets were being misappropriated and used for personal gain and not for my grandmother's behalf."

John testified that he was doing a good job caring for Amelia and that he would continue to do a good job. When asked if there was any reason why Mick could not do the job, John testified, "He has not seen my mother. He has no idea what's wrong with my mother, so I prefer to take care of my mother." John testified that he should be Amelia's guardian and conservator rather than Mick.

Gail Reznor, an ombudsman for the State of Nebraska, met with Amelia at John's request due to his concerns about the petition for guardianship. Reznor testified that she had asked Amelia how many children she had and that Amelia had told her four, three boys and a girl. Reznor testified that she had asked if John took care of Amelia's needs and that Amelia had said, " 'Yes, he's always taken care of me.' " Reznor further testified that she had asked if Amelia would prefer John or Mick to be her guardian and that Amelia had said " 'John.' " Reznor testified that the staff at Heritage told her that John took care of Amelia's health care needs and that he always paid the bill on time. From speaking with Amelia, John, and the staff at Heritage, Reznor opined that John was adequately caring for Amelia.

*Power of Attorney.*

As stated above, John was appointed as Amelia's attorney in fact in 1992. John testified that the power of attorney was prepared by attorney Gary Denton. The circumstances surrounding the execution of a power of attorney were that John's father was ill and that social services told John that he should take care of things, including putting his father in a nursing home and signing a power of attorney. John testified that he was chosen to be Amelia's attorney in fact because he was there to help his parents. He could not recall if he told his brothers and sister about the power of attorney. Caroline testified that she was never told that John had a durable power of attorney until August 2001.

John testified that he did not use the power of attorney to have his name placed on Amelia's bank accounts or to sign checks. John said that the durable power of attorney did not affect how he took care of his parents; he cared for his parents as a son. He testified that he had never used the durable power of attorney to sell any property or make any gifts to third parties from his parents' assets.

*Amelia's Mental Condition.*

Caroline testified that she usually visited Amelia once a year for 10 to 12 days. Caroline said that Amelia was having dementia in 1990 or 1991 and that Amelia's mental condition had gradually deteriorated since that time. Deborah testified that when Amelia last came to visit Deborah in Arizona in 1990, Amelia was becoming forgetful. Mick testified that Amelia started becoming forgetful in 1994 or 1995. Caroline testified that Amelia was "still very alert" in 1995, when Amelia allegedly told Caroline that John was stealing from Amelia and her husband.

In the summer of 1997, a family gathering was held in Amelia's home to discuss assisted living. All of Amelia's children attended, as well as some of her grandchildren, including Mick and Deborah. Caroline testified inconsistently that Amelia was physically safe and mentally alert in 1997, that Amelia was "showing lots of signs of dementia" in the summer of 1997, and that her mental condition had "deteriorated a lot" by the time of the hearing. Caroline said that Amelia was still mowing the lawn in 1997. When the family meeting took place in 1997, Caroline admitted that Amelia was very alert and understood what they were talking about. Deborah had contact with Amelia only once every 2 or 3 years, but she disagreed with Caroline's impression that Amelia was very alert in 1997. When asked to describe changes in Amelia's mental condition from the summer of 1997, Deborah testified instead about physical changes in that Amelia had broken her hip, was no longer able to walk, and was "no longer the grandma I knew who was in charge of everything." Deborah said that she would ask Amelia if Amelia would be able to walk soon or if she had tried and that Amelia would "just say I don't know." Deborah also testified that in March 1998, Amelia's husband seemed to be "removed from the reality of what was going on."

Mick testified that in 1997, Amelia "was alert, but she didn't remember everything from day to day and you could see that it was getting difficult for her to remember." He said he would agree with Caroline that Amelia "was alert and knew what was going on" at the time of the family meeting in 1997.

John testified that his parents' mental condition was fine in December 1997. Nolan, director of nursing at Heritage, testified

that Amelia recognized John and his wife, Gloria Hartwig, when they visited Amelia at Heritage.

*Quitclaim Deed.*

John testified that Amelia requested Denton to prepare a quitclaim deed but that John was not present when that request was made. John testified that Amelia told him, " 'You're the only one that cares about and comes to take care of us.' . . . 'So you get the home.' " John said he told his brother Don that the house had been deeded to John. He did not tell his other siblings, Caroline or Larry, because he assumed Don would do so. Caroline testified she was not aware of this conveyance until August 2001.

Since December 1997, John has not paid any real estate taxes on the home. He said there was a homestead exemption and no taxes had to be paid. The utilities have been paid out of the accounts of Amelia and her husband even though neither has lived there since June 2000. The property has been vacant since that time.

*Various "Loans" and Gifts.*

John testified that he had received loans from his parents for a car when he lived in Grand Island, Nebraska, and that he had paid those back. Although the evidence does not affirmatively establish when John lived in Grand Island, it appears that this was prior to the 1990's. Mick testified that he had received gifts from Amelia and her husband and that they had provided him with $4,000 to help buy a pickup. Mick said that after he repaid $2,000, the note evidencing the loan was torn up by Amelia's husband.

Ken Hartwig, John's 40-year-old son at the time of the hearing, borrowed $11,000 from Amelia on February 23, 1989. It was to be repaid with 8-percent interest in 1 year. An exhibit showed a check dated February 23, 1989, for $6,000 to Ken, signed by Amelia's husband. Ken has lived with John all through the 1990's. John testified he was not aware that Ken had borrowed $11,000 from Amelia and her husband in 1989 to buy a Suburban, and thus, John was not aware whether that loan was repaid. Ken got into the cattle business in 1994, but John did not know whether any money was borrowed from Amelia. An exhibit shows a check dated October 27, 1994, for $26,000 made payable to Ken and signed by Amelia. The memo line

states it was for cattle. John was unaware that his parents loaned Ken $26,000 in 1994.

On December 11, 1992, cashier's checks for $40,000 each were made payable to Caroline, Don and his wife, and John with the notation "remitter: Amelia Hartwig" at the top. The cashier's checks were evidenced, upon the advice of attorney Denton, by notes payable to Amelia on demand. Caroline testified that the money was a gift from Amelia but that she signed a note because "John said we were to sign this note because he was giving — He was acting on behalf of my parents so that each of use [sic] children would receive what would be our inheritance money." Caroline testified that Larry did not receive a $40,000 check, and no other evidence on this matter was presented. At some unknown point in time, Amelia gave Caroline Amelia's wedding ring and engagement ring, as well as another diamond ring. There was no evidence as to the value of these rings.

*Evidence Relating to Other Transactions.*

A time certificate of deposit belonging to Amelia or her husband was payable on death to John, Don, Caroline, and Larry. It was issued on December 5, 1994, and the maturity date was September 5, 1995. It was redeemed on January 30, 1995. The document states that a penalty of 1 month's interest will be imposed if any of the principal is withdrawn before the maturity date. John could not recall if he participated in the redemption, and he did not know what happened to the money redeemed, stating, "No I sure don't remember any of this."

John testified that he saw no reason to change the manner in which he had been handling Amelia's money matters. On December 31, 1991, John's name was added to the signature card of Amelia's account at FirsTier Bank. As power of attorney, John's name was added to his father's First National Bank account on February 2, 1998. Canceled checks from this account for the time from December 2000 to October 2001 show that each month checks were written to some combination of the following: Nebraska Public Power District; Kinder Morgan, Inc.; Heritage; City of Scottsbluff; and KN Energy. Each month, the account earned a small amount of interest and Social Security funds in the amount of $436 were deposited.

Carol Sinner, a registered nurse and supervisor at the Aging Office of Western Nebraska, knew Amelia and her husband through the Medicaid waiver program. Sinner explained that when a person is on Medicaid and they qualify for nursing home level of care, all of their medical needs are met through Medicaid and there is an additional budget provided by the state. If that person chooses to remain at home or in an assisted living facility, the additional budget pays for the care. Amelia's husband had initially chosen to remain at home until June 2000, so Sinner supervised his care and the budget. In order to qualify for Medicaid, an individual must have less than $4,000 and a couple must have less than $6,000 in assets. If more assets are owned than that amount, Sinner's office recommends to the family a number of things to spend assets down to the applicable dollar limit, such as purchasing irrevocable burial funds, paying someone to care for the family member, purchasing medical equipment, and making repairs to the home. Sinner testified that John was performing all activities of daily living for his father and "was spending 24 hours a day, seven days a week with his father and that . . . had been going on for several years." She was finally able to convince John to allow her to find some respite care for his parents at a cost of $40 per day. She testified that giving a house away for Medicaid purposes could be a fraudulent transfer, depending upon when the house was signed over and when the application for Medicaid was made.

John testified that he was not aware of whether Amelia had applied for life insurance in the last 3 or 4 years. An exhibit showed that on February 5, 1998, a life insurance policy insuring Amelia was bought for $6,580. John was named as the owner. John said this policy was for Amelia's funeral. The premium was paid out of Amelia's account.

Caroline testified that in 1994 or 1995, her parents told her that John was stealing from them, that they wanted to take his name off their bank accounts, and that they wanted to put Caroline's name on the accounts. Caroline testified that Amelia told her that Amelia saw John remove everything from Amelia's safe. A hearsay objection was made, and the court reserved ruling on it. Caroline testified that she and Amelia went to the bank, took John's name off the account, and opened a new bank

account with Caroline's name on it. Caroline said that about 6 weeks later, she was notified by the bank that John had removed her name and closed the account. He then removed the money and opened an account at a different bank.

Caroline testified that she obtained some of Amelia's bank records, went through them check by check, and saw that many large sums of money had been written to John or Ken. Deborah testified that in February 1995, she and her sister reviewed Amelia's bank statements that Caroline had obtained. Her sister prepared a handwritten spreadsheet of checks that Deborah felt were important to review, stating, "We were only looking at checks that were for large amounts." The spreadsheet contains checks and deposits from 1987 to 1995. Deborah testified that in August 1994, Amelia's checking account balance was $18, and that in November 1994, it "dropped" to $6,563. According to a ledger that Deborah's sister prepared, Amelia's checking account balance was $29,904 in October 1994. Based on this data, Deborah suggested that Caroline, Don, and Larry speak to an attorney in order to protect the assets of Amelia.

*Visitation of Amelia.*

Nolan, director of nursing at Heritage, testified that she saw Amelia and John together daily, that they were very happy together, and that she could see Amelia smile and brighten when John arrived. Nolan has never had a problem contacting John and testified that she saw him as much as she saw Amelia. Nolan did not know Mick and did not recognize him as a frequent visitor of Amelia. Hintergardt, administrator at Heritage, saw Amelia usually around 5 days a week. She said that John visited Amelia almost every afternoon. Hintergardt was not aware of ever seeing Mick at Heritage.

*Amelia's Health Care and Communication Among Family.*

Caroline testified that up until 1997, she would call John to ask about the medical needs and care of their parents. She guessed that she did this once every 3 months. She said that John would tell her just that their parents were doing okay and that they were fragile.

John's wife, Gloria, testified that when Amelia went to Heritage, Gloria sent a note each month for 6 months to Caroline

to inform her of Amelia's status. Gloria never received any sort of response from Caroline and quit sending notes because she heard that Caroline was calling someone else for information. Caroline denied ever receiving such notes. Regarding John and Gloria, Mick testified: "I don't have a relationship with them of any kind. I don't talk to them, I don't call them[.] There's no communication there."

John testified that when Amelia was hospitalized, he advised Caroline of the situation and what needed to be done. He testified that he never instructed Heritage not to allow other family members to see Amelia. Hintergardt testified that Caroline and Deborah spoke with her and wanted to be notified of all changes in Amelia's condition and to have input in whatever decisions needed to be made but that normally only the power of attorney is contacted when a health care decision needs to be made. Hintergardt said that John was upset that Caroline and Deborah asked if he had a power of attorney and that he asked Hintergardt not to share information with anybody else in the family, which she said was an unusual request. John testified he instructed Heritage not to release medical care information to other family members "[b]ecause I had — [t]hey said I had power of attorney and if they wanted to see, find out what was the matter with my mother, they could come ask me."

Caroline said that during the family meeting in 1997, it was expressed that the four children should make decisions concerning assisted living and John became very angry and violent, attacking Don. John testified that he had never asked Caroline to participate in health care decisions for Amelia with him because she lived in Arizona and decisions had to be made quickly. He made that offer to his brothers, and they told him to do it himself. John was asked if he would communicate with Caroline concerning health care issues if allowed to continue as Amelia's attorney in fact, and he answered, "I believe if [Caroline] was interested in knowing what her mother's health is, she can contact me."

Caroline testified she felt that John no longer had Amelia's best interests in mind because in August 2001, Caroline saw that Amelia needed to have a loose tooth taken care of and Amelia's hearing had deteriorated. Caroline did not tell John about these

perceived needs of Amelia, but she testified that she told the nurses at Heritage. Nolan testified that she did not see a real issue with Amelia's hearing and that Amelia did have two teeth which needed to be fixed but that the teeth were not a priority at the time because Amelia had bronchitis which needed to be resolved first. Nolan said that Caroline and Deborah were concerned about Amelia's hearing and teeth and that they asked about a mammogram for Amelia. Nolan felt that the mammogram inquiry was completely inappropriate considering that Amelia was 93 years old and had dementia, and the inquiry caused Nolan to hesitate because either Caroline and Deborah did not know the person they were talking about or they were unaware of Amelia's situation or her abilities. Nolan said that any time she hears something inappropriate coming from a family member, it causes her to be more careful about discussing confidential information, and that she usually then tries to redirect the family to the power of attorney.

*County Court's Order.*

In a journal entry, the trial court ordered, considered, adjudged, and decreed (1) that Amelia is an incompetent person, (2) that the appointment of a guardian and conservator for Amelia is necessary, (3) that Mick is a suitable and proper person to become guardian and conservator, (4) that persons with a higher priority for appointment are passed over, and (5) that John's authority under the durable power of attorney is terminated.

## ASSIGNMENTS OF ERROR

John alleges, summarized, that the court erred (1) in finding that a guardian and conservator needed to be appointed for Amelia, since he was her attorney in fact, and (2) in bypassing the statutory priorities in making that appointment.

John also assigned error to the court's allowing into evidence allegations of conduct which preceded the durable power of attorney, which allegations he asserts should not be considered by the court in a hearing on conservatorship or guardianship. John's brief did not contain an argument regarding this assigned error. Errors assigned but not argued will not be addressed. *Harris v. Harris*, 261 Neb. 75, 621 N.W.2d 491 (2001).

## STANDARD OF REVIEW

An appellate court reviews probate cases for error appearing on the record made in the county court. *In re Guardianship & Conservatorship of Donley*, 262 Neb. 282, 631 N.W.2d 839 (2001). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *In re Conservatorship of Anderson*, 262 Neb. 51, 628 N.W.2d 233 (2001).

## ANALYSIS

The power of a court to appoint a guardian is provided in Neb. Rev. Stat. § 30-2620 (Cum. Supp. 2002). In summary, § 30-2620 provides that the court may appoint a guardian if it is satisfied by clear and convincing evidence (1) that the person for whom a guardian is sought is incapacitated and (2) that the appointment is necessary or desirable as the least restrictive alternative available for providing continuing care or supervision of the person alleged to be incapacitated. The statute goes on to provide for the appointment of a limited guardianship unless the court finds by clear and convincing evidence that a full guardianship is necessary.

Neb. Rev. Stat. § 30-2630(2) (Reissue 1995) provides for the appointment of a conservator. It provides that the appointment of a conservator may be made "in relation to the estate and property affairs of a person" if the court is satisfied by clear and convincing evidence that the person (1) is unable to manage his or her property and (2) has property which will be wasted or dissipated unless proper management is provided, or if it is necessary or desirable to obtain funds for the support of the person.

The law is clear that either a conservator or a guardian should be appointed when the need under these statutes is shown to be clear and convincing. With regard to the element justifying the appointment of the guardian and conservator, the court found only that Amelia was incompetent, not that she was incapacitated. It found that a guardian and conservator was necessary, but it did not find that the appointment of a guardian was the least restrictive alternative available for providing for Amelia's continued care and supervision. In view of the undisputed evidence showing that

Amelia was being properly cared for in a nursing home, the issue of whether a guardian was needed was clearly before the court. The parties do not dispute that Amelia was unable to manage her property. The trial court found only that a conservator was necessary. It did not find that Amelia's property would be wasted or dissipated without the appointment of a conservator.

The evidence is undisputed that John was Amelia's attorney in fact under a durable power of attorney. Under the Uniform Durable Power of Attorney Act, Neb. Rev. Stat. §§ 30-2665 through 30-2672 (Reissue 1995), a durable power of attorney is not affected by disability or incapacity of the principal designating such attorney, and in the power of attorney, it is specifically provided that it should not be affected by disability or incapacity of the principal. See § 30-2665. A durable power of attorney may be withdrawn through the lawful revocation by the conservator of the estate. Section 30-2667(1) of the act provides that a guardian and conservator of a principal has the same power to revoke a power of attorney as the principal would have if he or she were not disabled or incapacitated. We find nothing that gives the trial court authority to terminate the power of attorney as part of the appointment of a guardian or conservator, but, rather, § 30-2667(1) gives that authority to the guardian and conservator. This is not to say that an appropriate court might not have the authority to cancel the power of attorney upon the grounds of fraud, undue influence, et cetera, as it could with any other document.

In Mick's brief, he argues that since John did not use the power of attorney, it should not give him any authority. It is clear that most powers of attorney are probably not used because the need to use them does not arise. The statute provides for the termination of the power of attorney. There is no statutory provision for termination of a power of attorney by reason of lack of use, nor does Mick cite any authority to support that argument.

Under § 30-2667(2), the principal may nominate, by a durable power of attorney, a conservator or guardian and the court shall make the appointment of the person so nominated except for good cause or disqualification. Neb. Rev. Stat. § 30-2627 (Cum. Supp. 2002) provides criteria for who is disqualified and who has a priority to act as a guardian, and Neb. Rev. Stat. § 30-2639

(Cum. Supp. 2002) provides criteria for who is disqualified and who has a priority to be appointed a conservator. Both of these statutes give first priority to the person most recently nominated in a power of attorney or a durable power of attorney. John clearly has the right to be appointed the guardian and conservator unless he was disqualified or good cause was shown. The court made no finding that John was disqualified.

The first question is really whether, in view of Amelia's proper care in a nursing home, her limited assets, and the existence of a durable power of attorney, there is any need for a guardian or conservator. In statutory terms, the questions are whether there was clear and convincing evidence that a guardianship is necessary or desirable as the least restrictive alternative to providing for Amelia's care and supervision and whether Amelia's assets would be wasted or dissipated if a conservator is not appointed. In view of the undisputed evidence of John's close attention to his mother and that Amelia is being cared for in the usual manner which elderly and infirm persons are cared for in our society, there simply is no evidence that she is not being properly cared for or that she would be better cared for if someone other than John possessed the power to care for her.

In statutory terms, a conservator should be appointed if the protected person's property will be dissipated or wasted unless proper management is provided. To be blunt, this question comes down to whether there is a reasonable basis for a finding that John will mismanage his mother's limited assets. Mick argues that John wasted Amelia's assets by participating in deeding the house to himself and by using her money to pay the utilities and expenses on a house that he owned. This statement is factually incorrect. There is no evidence that he participated in deeding the house to himself, and the record is clear that he does not own the house, but owns a remainder interest subject to Amelia's life estate. There is evidence that John was paying certain bills for Amelia's home from Amelia's bank account. The payment by a power of attorney of the expenses of a home in which the principal has a life estate and where the principal's personal property is kept is not a dissipation of that person's assets. Amelia still had a life estate in the home, and her personal property was apparently kept therein. There is no evidence

which shows it would have been in Amelia's interest to rent the house, and Mick does not argue that John should have rented the house. Since the evidence shows that Amelia was not living in the house and clearly had the right to rent it, at first blush that question arose to us. However, upon reflection, we realize that anyone vaguely familiar with the treatment of the homestead of an aged person on some form of public assistance would not presume that John should be renting the house. The lack of evidence on this issue does not amount to proof that John is breaching his fiduciary duty by not renting the house.

█ In our society, a great many people can expect to live to an age where they cannot expect to be able to manage their property or affairs or even their persons. A person approaching the age for the need of assistance with these things is allowed to name the persons who will provide for such assistance, and the Uniform Durable Power of Attorney Act was obviously intended to facilitate that right. The act provides that without good cause or disqualification, an elderly person cannot be deprived of the services of a validly appointed attorney in fact. Some of the witnesses testified that their complaints against John were that he would not supply them with information about Amelia's health and did not consult them in making certain decisions. We find nothing in the law that gives the extended family such a right to information about the health of the person, nor do we find any authority for the proposition that an attorney in fact under a power of attorney has the duty to consult the extended family on such issues. The extended family members, of course, have the right to visit that aged person.

## CONCLUSION

The evidence shows without dispute that Amelia's interests are being served by John in his capacity as her attorney in fact and that the durable power of attorney gave him the powers that a guardian and conservator would have. Therefore, we conclude as a matter of law that the appointment of a guardian and conservator for Amelia was unnecessary, and we reverse, and remand with direction to dismiss the proceedings.

REVERSED AND REMANDED WITH
DIRECTION TO DISMISS.