- 430 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

In re Guardianship and Conservatorship of Lorine Mueller,
an alleged incapacitated person.
Margo Loop, guardian and conservator, appellee,
v. Cheryl Mueller, appellant.

___ N.W.2d ___

Filed December 8, 2015.    Nos. A-14-780, A-14-971.

1. **Guardians and Conservators: Appeal and Error.** An appellate court reviews guardianship and conservatorship proceedings for error appearing on the record made in the county court.

2. **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

3. **Guardians and Conservators: Evidence.** A court may appoint a guardian under Neb. Rev. Stat. § 30-2620(a) (Cum. Supp. 2014) if it is satisfied by clear and convincing evidence that (1) the person for whom a guardian is sought is incapacitated and (2) the appointment is necessary or desirable as the least restrictive alternative available for providing continuing care or supervision of the person alleged to be incapacitated.

4. **Guardians and Conservators.** The persons eligible for appointment as guardian, as well as their respective priorities, are described in Neb. Rev. Stat. § 30-2627 (Reissue 2008). If it is in the best interest of the ward, a court may pass over a person having priority and appoint a person having lower or no priority.

5. **Guardians and Conservators: Agents.** If a guardian has been appointed and an attorney in fact has been designated and authorized under a valid power of attorney for health care, the attorney in fact's authority to make health care decisions supersedes the guardian's authority to make such decisions.

6. ____: ____. Neb. Rev. Stat. §§ 30-2628(c) (Cum. Supp. 2014) and 30-3420(5)(b) and (c) (Reissue 2008) do not preclude a court from

- 431 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

considering a ward's best interest and revoking or setting aside a health care power of attorney in favor of a guardianship when the facts support such action.

7. ____: ____. Under Neb. Rev. Stat. § 30-3421 (Reissue 2008), a court can revoke a power of attorney for health care upon finding (1) that the attorney in fact has violated, failed to perform, or is unable to perform the duty to act in a manner consistent with the principal's wishes or, when the principal's wishes are unknown, in the principal's best interest and (2) that the principal lacks the capacity to revoke the power of attorney.

8. **Guardians and Conservators: Evidence.** Under Neb. Rev. Stat. § 30-2630(2) (Reissue 2008), a court may appoint a conservator to manage a person's estate and property affairs if satisfied by clear and convincing evidence that (1) the person is unable to manage his or her property and property affairs effectively for reasons including mental illness, mental deficiency, or physical illness or disability and (2) the person has property that will be wasted or dissipated unless proper management is provided, or funds are needed for the support, care, and welfare of the person and protection is necessary or desirable to obtain or provide the funds.

9. **Guardians and Conservators: Agents.** Pursuant to Neb. Rev. Stat. § 30-2639(b)(1) (Reissue 2008), a person nominated in a power of attorney or acting under a power of attorney has first priority for appointment as conservator; however, if it is in the best interest of the protected person, a court may pass over a person having priority and appoint a person having lower or no priority.

10. ____: ____. A conservatorship may be necessary despite the existence of a power of attorney where an attorney in fact has violated his or her fiduciary duty, to act solely for the benefit of the principal, by engaging in self-dealing with the protected person's estate.

11. **Decedents' Estates: Wills: Words and Phrases.** A specific devise is a provision in a will that passes a particular piece of property. When specifically devised property ceases to be part of the estate at the time of the testator's death, ademption occurs.

12. **Estates: Wills: Sales: Presumptions: Words and Phrases.** Ademption by implied revocation occurs when specifically devised property is sold during the testator's lifetime. This type of ademption is based upon a presumed alteration of intention arising from the changed condition and circumstances of the testator, or on the presumption that the will would have been different had it been executed under the altered circumstances.

13. **Estates: Sales.** The common-law doctrine of ademption has been modified by statute under certain circumstances. Pursuant to Neb. Rev.

- 432 -

DECISIONS OF THE NEBRASKA COURT OF APPEALS
23 NEBRASKA APPELLATE REPORTS
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

Stat. § 30-2346(a) (Reissue 2008), when a conservator or guardian, not the testator, sells specifically devised property during the testator's lifetime, no ademption occurs. The proceeds of the sale are not included in the testator's residuary estate, but, rather, are given to the specific devisee to honor the specific devise.

14. **Guardians and Conservators: Estates.** Pursuant to Neb. Rev. Stat. § 30-2656 (Reissue 2008), in selecting the assets of a protected person's estate for distribution and utilizing the powers of revocation or withdrawal available for the support of the protected person, a conservator and the court should take into account any known estate plan of the protected person, including his or her will.

15. **Guardians and Conservators: Estates: Sales.** Given the heightened protection that specific devises receive by statute, a conservator taking into account a protected person's known estate plan should invade specifically devised property as a last resort, and only when doing so is clearly necessary for the protected person's care and support. Where there is ample property in a protected person's estate that can be sold to adequately fund the protected person's care without invading specifically devised property, the conservator and the court should not sell the specifically devised property unless circumstances clearly establish that it is in the protected person's best interests to do so.

Appeal from the County Court for Platte County: FRANK J. SKORUPA, Judge. Judgment in No. A-14-780 affirmed. Judgment in No. A-14-971 affirmed in part, and in part reversed.

Clark J. Grant, of Grant & Grant, for appellant.

Brenda K. Smith and Heather S. Voegele, of Dvorak & Donovan Law Group, L.L.C., for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

BISHOP, Judge.

Margo Loop was appointed guardian and conservator for her 94-year-old mother, Lorine Mueller, in the county court for Platte County, Nebraska. At the time of the appointment, Lorine suffered from moderate to severe Alzheimer's disease and dementia and resided in a skilled nursing facility. After appointing Margo, the county court authorized her to sell

- 433 -

DECISIONS OF THE NEBRASKA COURT OF APPEALS
23 NEBRASKA APPELLATE REPORTS
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

various real property to fund Lorine's care, including a 17.56-acre property owned by Mue-Cow Farms, Inc. (Mue-Cow), a corporation of which Lorine is the majority shareholder.

Cheryl Mueller, Lorine's daughter-in-law who lives in a farmhouse on the Mue-Cow property and alleges that she is a minority shareholder of Mue-Cow, appeals the orders appointing Margo guardian and conservator and authorizing her to sell the Mue-Cow property. Cheryl does not dispute that Lorine is incapacitated and unable to manage her property; instead, she argues that as Lorine's attorney in fact under powers of attorney for health care and asset management, she is capable of caring for Lorine and managing her property. She also argues that if a guardian and conservator were necessary, she had statutory priority for appointment. Cheryl challenges the order authorizing the sale of the Mue-Cow property because it fails to preserve Lorine's estate plan, in which Lorine devised the property to Cheryl.

As explained below, we affirm the county court's order appointing Margo guardian and conservator for Lorine. However, we reverse the county court's order authorizing Margo to sell the Mue-Cow property. We conclude that because Lorine specifically devised the Mue-Cow property to Cheryl in her will, and because there was sufficient property in Lorine's estate to adequately support her without selling the Mue-Cow property, it was error to authorize Margo to sell the Mue-Cow property absent circumstances establishing that it was in Lorine's best interests to do so.

## BACKGROUND

Lorine was born in January 1920 and had three children, Margo, Gary Mueller, and Randy Mueller. Margo has lived in Wichita, Kansas, since 1982; Gary has lived in St. Charles, Missouri, since 1991; and Randy died in 2001 while living in Columbus, Nebraska.

Until 1990, Lorine lived with her husband in the farmhouse on the Mue-Cow property, which is located in Platte County.

- 434 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

Lorine's husband conducted a dairy cow operation on the property and farmed adjoining parcels of land that totaled approximately 156 acres. Shortly before her husband passed away in 1991, Lorine and he moved into a house in the city of Columbus.

Cheryl was married to Lorine's son Randy. When Lorine and her husband moved to Columbus, Cheryl and Randy moved into the farmhouse on the Mue-Cow property and Randy managed the dairy cow operation and farm. In 2003, approximately 2 years after Randy passed away, Lorine sold her house in Columbus and moved back to the farmhouse to live with Cheryl. In March 2006, Lorine executed powers of attorney for health care and asset management, appointing Cheryl as her attorney in fact for health care and property-related decisions.

In March 2014, Lorine fell and broke her hip while still residing at the farmhouse. She underwent surgery and was admitted to Mory's Haven, a skilled nursing facility in Columbus, for rehabilitation.

In May 2014, while Lorine was at Mory's Haven, Margo and Gary filed a petition for appointment of a guardian and conservator for Lorine. They alleged that Lorine suffered from Alzheimer's disease and dementia and was in need of continuing medical care for her broken hip. They requested that Margo be appointed guardian and conservator but noted that Cheryl might have a prior right to appointment by virtue of the powers of attorney. Margo and Gary alleged that it would not be in Lorine's best interests to appoint Cheryl, because Cheryl planned to remove Lorine from Mory's Haven.

Cheryl objected to the petition, arguing that Lorine was not incapacitated and that appointing a guardian and conservator was not the least restrictive means of caring for Lorine or managing her property. Cheryl contended that the powers of attorney were less restrictive and accomplished the same goals.

- 435 -

DECISIONS OF THE NEBRASKA COURT OF APPEALS
23 NEBRASKA APPELLATE REPORTS
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

The court appointed Margo temporary guardian and conservator, pending a hearing on the petition.

*Guardian Ad Litem's Report*
*and Recommendation.*

Prior to the hearing on the petition, the guardian ad litem (GAL) appointed by the court for Lorine filed a report and recommendation. She confirmed that Lorine suffered from moderate to severe Alzheimer's disease and dementia. She further indicated that Lorine was in a wheelchair and that her doctor had advised that she should not "'be doing stairs from here on out.'" The GAL noted that the only bathroom in the farmhouse was located on the second floor, up a series of 24 steps.

The GAL stated that until Lorine's hospitalization in March 2014, Cheryl did not believe that she was acting in the capacity of Lorine's attorney in fact under the powers of attorney. The GAL reported that Cheryl was first listed on Lorine's bank account in September 2011. The GAL was concerned with the number of checks written to "'Cash'" and was unable to verify Cheryl's explanations for the checks. Cheryl told the GAL that she had not understood her fiduciary duties as attorney in fact and had signed checks at Lorine's direction and for convenience. Cheryl indicated that she and Lorine had shared home expenses and taken care of each other.

The GAL located seven lawsuits that were either collection or tax matters involving Lorine filed during the time that Cheryl held the powers of attorney. The GAL also discovered that Cheryl's father had loaned money for the payment of delinquent taxes on Lorine's properties and that promissory notes and deeds of trust issued as security for the notes were recorded against the properties. The GAL reported that Cheryl's father was recently deceased and that Cheryl was a beneficiary of his estate.

The GAL noted that in addition to Lorine's Mue-Cow shares and the parcels of land adjoining the Mue-Cow property,

Lorine owned a rental home in Columbus and leased a lot at Wagner Lakes. The rental home had not had a tenant for 3 years due to water damage that occurred after the last tenant moved out. Cheryl told the GAL that the damage had been repaired and that the repairs had been funded in part using a loan from Cheryl's father. The Wagner Lakes lot did not produce any income.

The GAL indicated that an individual had farmed approximately 70 to 80 acres of Lorine's land for the prior 3 years under an oral agreement for a 50-50 crop share. Cheryl informed the GAL that the agreement with that individual had not been as profitable as preferred during its first 2 years because of drought, lack of crop insurance, and other factors. Cheryl reported that crop insurance had since been obtained.

The GAL stated that Cheryl had consistently taken Lorine to doctors' appointments over the years. However, the GAL was concerned that Lorine had not received proper dental care and had experienced tooth decay and broken teeth. Cheryl told the GAL that Lorine had not wanted to receive followup care after she was fitted for dentures between 2003 and 2005 because they caused her pain.

The GAL further reported that during Lorine's time at Mory's Haven, the administrative staff had limited the times that Cheryl could visit. The staff had been concerned with how Cheryl treated Lorine, including that Cheryl was withholding snacks from her and attempting to have her walk without the proper assistance. Under the restrictions, Cheryl was permitted to visit Lorine only when a member of the administrative staff was present.

The GAL stated that Margo was concerned that Cheryl planned to move Lorine back to the farmhouse as soon as possible. Margo was also concerned with the lack of dental care and with Cheryl's handling of Lorine's finances. The GAL noted that Margo had not had much contact with Lorine for a number of years, but observed that Margo and Cheryl gave differing explanations for this.

- 437 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

The GAL recommended that Margo be appointed guardian and conservator. The GAL did not believe that it would be in Lorine's best interests to appoint Cheryl, due to her financial interests in Lorine's property, including her status as a beneficiary of her father's estate. Further, Cheryl lived on the property owned by Mue-Cow, in which Lorine held a majority interest and, according to the GAL, Cheryl owned a minority interest.

*Hearing on Petition to Appoint*
*Guardian and Conservator.*

On July 22, 2014, the court held a hearing on the petition. Because Cheryl does not dispute on appeal that Lorine is incapacitated and unable to manage her property, we only briefly summarize the testimony relating to Lorine's incapacity. According to Cheryl, Lorine stopped driving at her doctor's recommendation approximately 5 years prior to the date of the hearing because she would get lost. Gary testified that Lorine had suffered from memory problems for a "very, very long time" and that when he visited her in July 2011, Lorine initially did not know who he was and did not know where he lived or the names of his children. While a resident at Mory's Haven in 2014, Lorine tested in the "severe impairment" category on mental status examinations. The record reflects that at the time of the hearing, Lorine suffered from moderate to severe Alzheimer's disease and dementia, did not understand where she resided, did not know her children's names, and had difficulty following conversation.

The first two witnesses were Sue Bougger, the social service director at Mory's Haven, and Terri Groteluschen, the administrator of Mory's Haven. Bougger testified that when Cheryl visited Lorine at Mory's Haven, Lorine's mood became "more subdued, apprehensive, [and] intimidated." Bougger described Cheryl as abrupt and said that she yells and causes "quite a commotion." Bougger indicated that Cheryl had taken foods away from Lorine, even though they were not medically restricted. Groteluschen confirmed this

- 438 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

and testified that she had restricted Cheryl to visiting Lorine only when a member of the administrative staff was present. During Groteluschen's 11 years at Mory's Haven, she had placed restrictions on a person's visitation only one other time. She placed the restrictions on Cheryl because staff members felt that they were unable to care for Lorine with Cheryl's disruptions.

Bougger testified that when Margo was present, Lorine was content and peaceful. Bougger described Margo as open, conscientious, and appropriately concerned about Lorine's care. Groteluschen testified that she had seen Margo at Mory's Haven frequently and that Margo was very caring.

Lorine's son Gary testified that after Margo was appointed temporary guardian and conservator, she gave him access to Lorine's bank records for the past 3 to 4 years. He observed that Lorine received no income from the rental home in Columbus, for the Wagner Lakes lot, or for the Mue-Cow property. Lorine received between $5,000 and $7,000 per year in income from her farmland.

Gary explained that as part of his job at the Federal Deposit Insurance Corporation, he examined agricultural banks, which required reviewing farm loans made by those banks. Based on his work experience and on his time helping on the farm as a minor, he prepared cashflow projections for the years 2010 to 2014 for Lorine's properties, including a 48-acre parcel used for pasture, a 99-acre parcel that was tillable, and the rental home in Columbus. His projections of total cashflow for the properties based on treating the 99 acres as dryland were between $24,000 and $34,000 per year; treating the 99 acres as irrigated raised the projections to between $31,000 and $44,000.

Gary testified that after Lorine broke her hip in March 2014, he learned that Cheryl had removed him from the list of persons approved to access Lorine's hospital records. Margo had since placed his name back on the list. Gary's concern with Cheryl was that due to her daycare business and Lorine's

- 439 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

specialized needs, Cheryl did not have adequate time to care for Lorine.

Margo testified that during the past 5 years it had been very difficult to visit Lorine because Cheryl had restricted Margo's access to her. Margo attended a class reunion the prior summer and was told it was not a good time to visit Lorine. Lorine did not have a landline or a cell phone, which also made access difficult. Margo purchased a cell phone for Lorine in 2004, but she never learned to use it.

Margo testified that since being appointed temporary guardian and conservator, she had reviewed Lorine's financial records and inspected her property, although she had not been allowed inside the farmhouse on the Mue-Cow property. At the time of her temporary appointment, there was no insurance on the properties; Margo had since obtained insurance policies for them.

Margo had discovered that "large sums of cash" had been withdrawn from Lorine's bank accounts following the execution of the powers of attorney in March 2006. Although Margo's testimony fails to provide a specific timeframe, she testified that in 1 month, there was $2,000 in checks written to a grocery store. There were checks written for car insurance after Lorine was unable to drive and checks written for groceries and for discount store purchases after Lorine was admitted to Mory's Haven. All of the checks were signed by Cheryl.

Margo confirmed that promissory notes and deeds of trust had been recorded against all of Lorine's properties in Platte County. The promissory notes and deeds of trust, which were admitted into evidence, reflected a total of $31,389.60 in loans from Cheryl's father to Lorine between February and April 2007.

Margo further testified that five foreclosure cases brought by the purchasers of tax liens had been filed in Platte County against Lorine's properties in recent years. Copies of the complaints for foreclosure were admitted into evidence.

- 440 -

DECISIONS OF THE NEBRASKA COURT OF APPEALS
23 NEBRASKA APPELLATE REPORTS
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

According to Margo, after Lorine's rental property in Columbus sustained water damage in 2009, an insurance company issued a check for $48,429. Margo confirmed that $22,000 went to a contractor for demolition and mold abatement. Margo was still attempting to find out what happened to the remaining $26,000 in insurance proceeds. Lorine's bank records did not show a deposit of funds in that amount.

Margo testified that in 1977, Lorine and her husband entered into a 50-year lease for the Wagner Lakes lot, which had a small cabin on it. In May 2007, the lease was assigned to Lorine and Cheryl jointly. To Margo's knowledge, Cheryl had not compensated Lorine for the assignment.

Margo identified copies of notices of state and federal tax liens for unpaid taxes recorded in Platte County against any property in which Cheryl had an ownership interest. The tax liens were issued between 2005 and 2012 and totaled over $76,000.

Margo testified that she and her husband have owned and operated an interior landscaping business in Wichita for 30 years. The corporation is in good standing and has not had any tax liens or judgments rendered against it.

When asked why she was seeking to be appointed guardian and conservator for Lorine, Margo testified that Lorine needed her help and that she was trying to do the right thing. Her first goal would be to ensure that Lorine had enough assets to pay for her care. Margo believed that Lorine needed 24-hour supervision.

Margo characterized Cheryl's treatment of Lorine as controlling, demeaning, and disrespectful. According to Margo, after Lorine was admitted to the hospital for her broken hip, her hair was matted, she smelled as if she had not taken a bath in a very long time, and her toenails were an inch long.

At this point in the hearing on the petition, Margo and Gary rested and Lorine's attorney called the GAL as her only witness. The GAL testified that since completing her report, she had revised her recommendation to be that a neutral third

- 441 -

DECISIONS OF THE NEBRASKA COURT OF APPEALS
23 NEBRASKA APPELLATE REPORTS
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

party should be appointed guardian and conservator, although she did not have a specific person in mind. The considerations supporting the change were that Margo lived out of state and that there was "a lot of family tension." She believed that it might be "a fairly excessive strain" on Lorine to be moved out of state and that if a family member were appointed, there would be ongoing disputes. The GAL reiterated that Cheryl should not remain serving under the powers of attorney; she noted that Cheryl had not acted in Lorine's best interests when handling finances and that Lorine had not received proper dental care under her supervision.

Cheryl testified in her own behalf. She testified that she had operated a daycare since 1988. After Lorine's husband died, Lorine would come to the daycare to read stories to the children. For at least 5 years prior to the date of the hearing, during which time Lorine suffered from dementia and could not drive, Cheryl would bring Lorine to the daycare daily, where Lorine would play with the children, read them stories, and fold laundry.

According to Cheryl, Lorine decided to move back to the farmhouse (in 2003) so that she and Cheryl could pool their resources and take care of each other. Cheryl testified that she wrote checks out of Lorine's account for living expenses, because she and Cheryl "just paid the bills as they needed."

When asked why the taxes were not paid for Lorine's properties, Cheryl explained that it was due to "[l]iving expenses and trying to make it day-to-day." She testified, "I'll admit, I'm not making good choices. I'm trying to learn from those experiences and make good choices." She testified that the "state tax liens" and "tax lien foreclosures" had been resolved using a combination of Cheryl's money, Lorine's money, and loans from Cheryl's father.

Cheryl testified that the insurance proceeds from the water damage to Lorine's rental home went to paying for new "electrical," for a new furnace and water heater, and to "adjust the plumbing." Prior to the filing of Margo and Gary's petition,

- 442 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

Cheryl and Lorine's plan had been to sell the rental property to pay the delinquent taxes.

Cheryl testified that she would not remove Lorine from Mory's Haven without a doctor's approval. In anticipation of Lorine's possible release, Cheryl had planned on conducting a home study to determine what was needed for Lorine to live in the farmhouse. The home study had not been completed, in part because the physical therapist had recommended waiting to see how Lorine progressed.

The county court took the matter under advisement and, on August 1, 2014, issued a written ruling. It first addressed the appointment of a conservator, finding that there was clear and convincing evidence that a conservator was necessary. The court found that Lorine suffered from mental and physical disabilities that left her unable to manage her property and that her property would be wasted or dissipated without proper management. The court rejected Cheryl's argument that a conservator was unnecessary in light of her status as Lorine's attorney in fact under the power of attorney for asset management. The court found that Cheryl had "done a poor job of asset management and quite possibly breached the fiduciary duty that an agent has toward a principal." The court further found that it was in Lorine's best interests to pass over Cheryl, even though she had statutory priority for appointment as Lorine's conservator. It found that although there was animosity between Margo and Cheryl, it was in Lorine's best interests to appoint Margo, the person with next priority, as conservator.

Addressing the appointment of a guardian, the court found that there was clear and convincing evidence that Lorine was incapacitated. The court then addressed Cheryl's argument that a guardian was unnecessary because Cheryl had been named Lorine's attorney in fact under the power of attorney for health care. The court acknowledged that Cheryl was concerned about Lorine's care, but found that Cheryl had been "difficult to work with regarding Lorine's physical placement"

- 443 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

and that her conduct had resulted in restriction of her visitation privileges at Mory's Haven. The court also noted that Cheryl had "blocked Lorine's children from obtaining information" about her health and possibly restricted their contact with Lorine. The court acknowledged Cheryl's statutory priority for appointment as guardian, but found that it was in Lorine's best interests to pass over Cheryl and appoint Margo as her guardian. The court found that a full guardianship was "necessary" and the "least restrictive alternative." The court listed the powers conferred upon Margo as guardian, including the power to arrange for Lorine's medical care.

On August 15, 2014, letters of guardianship and conservatorship were issued. The letters required Margo to obtain court approval before selling real property belonging to Lorine.

Cheryl timely filed a notice of appeal from the court's August 1, 2014, order, which appeal was docketed as case No. A-14-780. The county court then appointed Margo special guardian and conservator pending appeal pursuant to Neb. Rev. Stat. § 30-1601(4) (Cum. Supp. 2014).

*Motion for Authority to Act.*

On September 24, 2014, Margo filed a "Motion for Authority to Act" in which she sought court approval for, among other things, preparing the Mue-Cow property and adjoining farm parcels for auction "so that the proceeds therefrom may be used to support" Lorine. The motion indicated that Lorine had been transferred to an assisted living facility in Wichita. A separately filed "Application for Withdrawal of Funds" stated that Lorine's recurring monthly expenses at the facility totaled $6,275. An inventory of Lorine's assets valued the Mue-Cow property at $110,795, the adjoining 99-acre parcel at $489,535, the adjoining 48-acre parcel at $67,910, the rental home in Columbus at $60,000, and the Wagner Lakes cabin at $46,000.

At the October 23, 2014, hearing on Margo's motion, Rick Grubaugh, a real estate broker and auctioneer, testified that

- 444 -

DECISIONS OF THE NEBRASKA COURT OF APPEALS
23 NEBRASKA APPELLATE REPORTS
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

Margo had contacted him about selling Lorine's properties. He testified that the Mue-Cow property could be used for residential or agricultural purposes but explained that because the property was in a floodway, an owner could not add to existing buildings or construct new buildings. He opined that selling the Mue-Cow property and adjoining parcels of land at the same time would bring the highest price, because it would attract the greatest variety of buyers and because advertising costs would be minimized. In Grubaugh's opinion, the Mue-Cow property would not appreciate in value in its current state, because it needed maintenance. Upon further examination by the court, Grubaugh admitted that he was "guessing" it would be advantageous to sell the tracts together and that excluding the Mue-Cow property from the sale may not have any effect on the sales prices of the other properties.

Margo testified that in her role as guardian and conservator, she had obtained a $75,000 loan to pay for Lorine's nursing home, medical expenses, taxes, and debts. She had spent approximately $46,000 of the borrowed funds, and the court had authorized her to utilize more funds on various expenses. The remaining funds would cover Lorine's expenses through November 2014. Lorine's only income at that time was Social Security of $594 per month.

Margo testified that in September 2014, she reviewed Mue-Cow's corporate records, including a stock ledger, of which she created a summary. The stock ledger and summary showed that as of August 1, Lorine owned 6,799 shares of stock; the only other shareholder of record was Cheryl's deceased husband, Randy, who was listed as the owner of 1,201 shares.

Margo believed that the Mue-Cow property should be sold because it was "the biggest strain on [Lorine's] income." The property had not produced income in a number of years, and because Lorine received no rent for the property, she lost money by retaining it. Margo believed that selling the Mue-Cow property was in Lorine's best interests, because Lorine "desperately need[ed] money . . . to stay in her nursing

home." When asked if she understood that as conservator, she was obligated to take into account any known estate plan, Margo testified that she was "aware of it" but also was aware that she needed to "look at [Lorine's] immediate needs first and to take care of the best interest of [Lorine]."

On cross-examination, Cheryl's attorney began asking Margo about the status of the shareholders in Mue-Cow. The county court interjected and questioned whether it had authority to address the issue of stock ownership in this proceeding. During discussion among the attorneys and the court, Cheryl's attorney indicated that a belated probate estate may have to be opened to address ownership of the shares recorded in Randy's name.

Gary testified that based on his review of Mue-Cow's records and income for the prior 5 years, he did not believe that it would produce any income that could be used for Lorine's support.

Margo and Gary rested, and Cheryl called a real estate broker who testified that he had viewed the properties. The broker did not believe that selling the Mue-Cow property with Lorine's other properties would increase the sale prices.

Cheryl testified that she was willing to pay the Mue-Cow property's expenses, including utilities and maintenance, so that the property would not be a financial drain. Cheryl then offered into evidence a copy of Lorine's will, which the parties had previously filed with the court pursuant to a joint stipulation. The will specifically devised to Cheryl Lorine's personal property, farm machinery, equipment, and livestock; Lorine's shares in Mue-Cow, including any real estate owned by Mue-Cow; and Lorine's interest in the lease of the Wagner Lakes lot and the cabin on the lot. Lorine's residuary estate was divided equally between Margo, Gary, and Cheryl.

At the conclusion of the hearing, the court granted Margo's motion, authorizing her to sell the Mue-Cow property and adjoining parcels of land. The court indicated that it found persuasive Grubaugh's testimony regarding the advisability

- 446 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

of selling the properties at the same time. The court's ruling granting the motion was memorialized in a journal entry and order filed October 23, 2014.

Cheryl timely filed a notice of appeal from the court's order, which appeal was docketed as case No. A-14-971.

On Cheryl's motion, this court consolidated Cheryl's appeals for briefing and decision and allowed the supersedeas bond that she filed on appeal in case No. A-14-780 to serve as the supersedeas bond in the consolidated appeals. Cheryl requested that her supersedeas bond suspend the court's October 23, 2014, order only insofar as it authorized Margo to sell the Mue-Cow property.

### ASSIGNMENTS OF ERROR

Cheryl assigns that the county court erred in (1) determining that the appointment of a guardian for Lorine was the least restrictive means of providing for her care; (2) determining that it was in Lorine's best interests not to appoint Cheryl as her guardian despite Cheryl's statutory priority for appointment; (3) determining that the appointment of a conservator was necessary to manage Lorine's property; (4) determining that it was in Lorine's best interests not to appoint Cheryl as her conservator despite Cheryl's statutory priority for appointment; (5) appointing Margo, rather than a neutral third party, as guardian and conservator; and (6) authorizing Margo to sell the Mue-Cow property.

### STANDARD OF REVIEW

[1,2] An appellate court reviews guardianship and conservatorship proceedings for error appearing on the record made in the county court. *In re Guardianship of Benjamin E.*, 289 Neb. 693, 856 N.W.2d 447 (2014). When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id*.

- 447 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

## ANALYSIS

*Appointment of Margo as Guardian.*

In support of her first and second assignments of error, Cheryl argues that because she was Lorine's attorney in fact under the power of attorney for health care, either no guardian was necessary or she had statutory priority for appointment. Cheryl contends that she "should be allowed to continue to act as attorney in fact for healthcare unless good cause is shown to the contrary." Brief for appellant at 14. Further, Cheryl states that appointing a guardian for Lorine is not "the least restrictive alternative available for providing her continuing care and supervision." *Id.* at 15.

We first address whether the county court erred in not permitting Cheryl to continue to act as Lorine's attorney in fact for health care. A power of attorney for health care is a document executed in accordance with Neb. Rev. Stat. §§ 30-3401 to 30-3432 (Reissue 2008) that authorizes a designated attorney in fact to make health care decisions for the principal when the principal is incapable. § 30-3402(10). Health care decisions include "consent, refusal of consent, or withdrawal of consent to health care." § 30-3402(5). "Health care" means "any treatment, procedure, or intervention to diagnose, cure, care for, or treat the effects of disease, injury, and degenerative conditions." § 30-3402(4). A health care power of attorney becomes effective upon a determination pursuant to § 30-3412 that the principal is incapable of making health care decisions. § 30-3411. The attorney in fact has a duty to consult with medical personnel and make health care decisions in accordance with the principal's wishes or, if his or her wishes are unknown and cannot with reasonable diligence be ascertained, with the principal's best interests. § 30-3418(1).

[3,4] By comparison, a court may appoint a guardian under Neb. Rev. Stat. § 30-2620(a) (Cum. Supp. 2014) if it is satisfied by clear and convincing evidence that (1) the person for whom a guardian is sought is incapacitated and (2) the appointment is necessary or desirable as the least restrictive

alternative available for providing continuing care or supervision of the person alleged to be incapacitated. The persons eligible for appointment as guardian, as well as their respective priorities, are described in Neb. Rev. Stat. § 30-2627 (Reissue 2008). Pertinent here, a person nominated by the incapacitated person in a power of attorney, or a person acting under a power of attorney, has first priority for appointment, while an adult child of the incapacitated person has third priority. § 30-2627(b)(1) and (3). If it is in the best interest of the ward, a court may pass over a person having priority and appoint a person having lower or no priority. § 30-2627(c).

Unless limited by the court, a guardian appointed pursuant to § 30-2620(a) has the same powers, rights, and duties respecting the ward that a parent has respecting an unemancipated minor child. Neb. Rev. Stat. § 30-2628(a) (Cum. Supp. 2014). Those powers and duties include having custody of the ward and establishing the ward's place of abode; making provision for the care, comfort, and maintenance of the ward; and giving any consents or approvals necessary to enable the ward to receive medical or other professional care, counsel, or treatment. § 30-2628(a)(1) through (3).

[5] If a guardian has been appointed and an attorney in fact has been designated and authorized under a valid power of attorney for health care, the attorney in fact's authority to make health care decisions supersedes the guardian's authority to make such decisions. The guardianship statute provides that nothing in a guardian's power "shall be construed to alter the decisionmaking authority of an attorney in fact designated and authorized under sections 30-3401 to 30-3432 to make health care decisions pursuant to a power of attorney for health care." § 30-2628(c). Similarly, the statute governing health care powers of attorney provides that unless the power of attorney provides otherwise, a valid power of attorney for health care supersedes any guardianship or conservatorship proceedings to the extent the proceedings involve the

- 449 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

right to make health care decisions for the protected person. § 30-3420(5)(b) and (c).

As applied to the case before us, these statutes would permit the county court to appoint a guardian under § 30-2620(a) if it is satisfied by clear and convincing evidence that (1) the person for whom a guardian is sought is incapacitated and (2) the appointment is necessary or desirable as the least restrictive alternative available for providing continuing care or supervision of the person alleged to be incapacitated. Further, the county court could pass over Cheryl, a person having priority, and appoint Margo, a person having lower priority, if it was in Lorine's best interests.

[6] These statutes, therefore, permit the coexistence of a guardian and an attorney in fact for health care, but the statutes also make it clear that the authority of the attorney in fact for health care supersedes a guardian's authority when it comes to making health care decisions for the protected person. In the present case, this would mean that despite the county court appointing Margo as guardian, for matters related to Lorine's health care, Cheryl still retained the ultimate authority over health care decisions if her health care power of attorney remained intact. Importantly, however, the statutes discussed above do not preclude a court from considering a ward's best interest and revoking or setting aside a health care power of attorney in favor of a guardianship when the facts support such action.

[7] *In re Trust Created by Nabity*, 289 Neb. 164, 854 N.W.2d 551 (2014), provides such an example. In 1998, a woman executed a power of attorney for health care designating her two daughters as attorneys in fact. After the woman was diagnosed with Alzheimer's disease in 2011, her son petitioned for appointment of a guardian and conservator. One daughter objected on the basis that she was the woman's attorney in fact, and the son moved for a determination of the validity of the power of attorney. Following a hearing, the court set aside the 1998 health care power of attorney pursuant to § 30-3421(1)(d),

- 450 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

which provides that a court can revoke a power of attorney for health care upon finding (1) that the attorney in fact has violated, failed to perform, or is unable to perform the duty to act in a manner consistent with the principal's wishes or, when the principal's wishes are unknown, in the principal's best interest and (2) that the principal lacks the capacity to revoke the power of attorney. The court reasoned that the daughters had failed to act in the woman's best interests by not acknowledging the severity of her condition, not obtaining proper medical care or abiding by physicians' recommendations, and allowing her to make her own health care decisions. After revoking the power of attorney, the court appointed a guardian and conservator for the woman.

The Nebraska Supreme Court affirmed the decision to revoke the power of attorney, determining that the court's finding that the daughters had not acted in the woman's best interests was "amply supported by the evidence." *In re Trust Created by Nabity*, 289 Neb. at 181, 854 N.W.2d at 564. The Supreme Court also rejected the objecting daughter's argument that the 1998 health care power of attorney should have superseded the guardianship, reasoning that there was no valid power of attorney for health care because it was properly set aside. *In re Trust Created by Nabity, supra*.

Although in the case before us, the county court did not expressly revoke the power of attorney for health care prior to appointing a guardian, as the court did in *In re Trust Created by Nabity*, its decision to pass over Cheryl for appointment as guardian involved consideration of the same factors necessary to revoking or setting aside a power of attorney. In finding that it was in Lorine's best interests to pass over Cheryl for appointment, the court in essence determined that Cheryl had failed to act or was unable to act in Lorine's best interests in her role as attorney in fact for health care, which is consistent with the provision in § 30-3421(1) authorizing a court to revoke a power of attorney for health care upon such a finding. The court's finding was supported by

- 451 -

DECISIONS OF THE NEBRASKA COURT OF APPEALS
23 NEBRASKA APPELLATE REPORTS
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

competent evidence, including that (1) Cheryl's disruptive conduct while Lorine was at Mory's Haven resulted in her visitation privileges' being limited, which Groteluschen testified had occurred only one other time in her 11 years at Mory's Haven; (2) when Lorine was admitted to the hospital in March 2014 for her broken hip, her hair was matted, she smelled as if she had not taken a bath in a very long time, and her toenails were an inch long; and (3) although Lorine's dental problems began before the health care power of attorney was signed or became effective, Cheryl had not ensured that Lorine received proper dental care even after Lorine began suffering from Alzheimer's disease and dementia, which the record reflects had reached a moderate to severe level by the time Lorine was admitted to Mory's Haven.

A reading of the court's order in light of this evidence makes it clear that in deciding to pass over Cheryl for the appointment, the court was focused on Cheryl's ability to fulfil her duties as Lorine's attorney in fact for health care. Notably, after finding that it was in Lorine's best interests to appoint Margo as guardian despite Cheryl's statutory priority for appointment, the court explicitly granted Margo the power to arrange for Lorine's medical care. Such a determination necessarily indicates that the court was setting aside or invalidating Cheryl's health care power of attorney in favor of Margo having a guardianship with full authority for health care decisions. While not articulated as precisely as may be preferred, the court's decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

Cheryl also argues that the county court erred in determining that the appointment of a guardian for Lorine was the least restrictive means of providing for her care. Under the circumstances of this case, for the county court to determine that a guardianship was not the least restrictive alternative available, the court would have had to find that Cheryl was able to care for Lorine in her capacity as Lorine's attorney in fact

for health care. However, as stated, the evidence supported the contrary finding, and the court therefore did not err in determining that a full guardianship was "necessary" and "the least restrictive alternative" and did not err in passing over Cheryl for the appointment. See *In re Trust Created by Nabity*, 289 Neb. 164, 183, 854 N.W.2d 551, 565 (2014) ("[g]iven that [the proposed ward] cannot make decisions for herself, there is clear and convincing evidence that a permanent guardianship is necessary and is the 'least restrictive alternative available for providing continuing care' for her").

We disagree with Cheryl that *In re Guardianship & Conservatorship of Hartwig*, 11 Neb. App. 526, 656 N.W.2d 268 (2003), compels a different result. In 1992, prior to the effective date of the health care power of attorney statute, a woman executed a power of attorney designating her adult son as her attorney in fact for property and health care decisions. In 1998, after the woman showed signs of dementia, she was placed at a health care center where the son visited her on a daily basis and had a good relationship with her. The evidence established that the son and the nursing home staff adequately cared for the woman. When her grandson successfully petitioned for a guardianship and conservatorship in 2001, resulting in the termination of the son's authority under the power of attorney, this court reversed, and restored the son's authority because there was no evidence that the woman was not receiving proper care.

*In re Guardianship & Conservatorship of Hartwig* is distinguishable from our case. Lorine was admitted to Mory's Haven for rehabilitation following her surgery for her broken hip. Although her immediate medical needs may have been addressed, it was imminent that a permanent placement would need to be chosen for her, and there were legitimate concerns about Cheryl's ability to make that decision in Lorine's best interests. As discussed, the concerns arose out of Cheryl's treatment of Lorine at Mory's Haven, Cheryl's behavior that resulted in her visitation privileges' being restricted, and other

- 453 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

evidence that Lorine had not been properly cared for while under Cheryl's supervision. Although Cheryl testified that she would not move Lorine back to the farmhouse without a physician's approval, there was evidence that Cheryl had begun investigating ways for Lorine to return there. In contrast to *In re Guardianship & Conservatorship of Hartwig*, at the time Margo and Gary filed the petition to appoint a guardian and conservator, Lorine was not well settled in a nursing facility with her care and support adequately provided for into the foreseeable future.

*Appointment of Margo as Conservator.*

In support of her third and fourth assignments of error, Cheryl argues that Margo and Gary failed to prove by clear and convincing evidence that Lorine's property would be wasted or dissipated if a conservator were not appointed. She further argues that as Lorine's attorney in fact under the power of attorney for asset management, she had priority for appointment as conservator.

[8] Under Neb. Rev. Stat. § 30-2630(2) (Reissue 2008), a court may appoint a conservator to manage a person's estate and property affairs if satisfied by clear and convincing evidence that (1) the person is unable to manage his or her property and property affairs effectively for reasons including mental illness, mental deficiency, or physical illness or disability and (2) the person has property that will be wasted or dissipated unless proper management is provided, or funds are needed for the support, care, and welfare of the person and protection is necessary or desirable to obtain or provide the funds.

[9] Pertinent here, a person nominated in a power of attorney or acting under a power of attorney has first priority for appointment as conservator, while an adult child has fifth priority. Neb. Rev. Stat. § 30-2639(b)(1) and (5) (Reissue 2008). If it is in the best interest of the protected person, a court may pass over a person having priority and appoint a person

- 454 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

having lower or no priority. § 30-2639(c). A conservator's powers are listed in Neb. Rev. Stat. §§ 30-2653 and 30-2654 (Reissue 2008) but may be limited by the court. Neb. Rev. Stat. § 30-2655 (Cum. Supp. 2014).

The Nebraska Uniform Power of Attorney Act applies to powers of attorney, other than health care powers of attorney (Neb. Rev. Stat. § 30-4003(2) (Cum. Supp. 2014)), "created before, on, or after January 1, 2013" (Neb. Rev. Stat. § 30-4045(1) (Cum. Supp. 2014)). The act authorizes a principal to nominate a conservator or guardian in his or her power of attorney for consideration by the court in the event that protective proceedings for the principal's estate or person are commenced. Neb. Rev. Stat. § 30-4008(1) (Cum. Supp. 2014). A person appointed guardian or conservator has the same power to revoke or amend the power of attorney that the principal would have had if he or she were not disabled or incapacitated. § 30-4008(2). (We note that the health care power of attorney statute discussed previously contains no similar provision permitting a guardian or conservator to revoke the power of attorney for health care. See §§ 30-3401 to 30-3432.)

*In re Conservatorship of Anderson*, 262 Neb. 51, 628 N.W.2d 233 (2001), provides an example of when a conservatorship may be necessary despite the existence of a power of attorney. In that case, a man appointed his daughter and son-in-law as his attorneys in fact in a durable power of attorney. After November 1998, when the man was admitted to a nursing facility, the daughter and son-in-law took over management of his property and affairs. In the following 2 years, the daughter and son-in-law made gifts from the estate to themselves and their children. After two of the man's grandchildren petitioned for appointment of a conservator for him, the court appointed a bank, a neutral third party, as conservator.

[10] The Nebraska Supreme Court affirmed, reasoning that by making gifts to themselves from the estate, the daughter and son-in-law had violated their fiduciary duties as attorneys

- 455 -

DECISIONS OF THE NEBRASKA COURT OF APPEALS
23 NEBRASKA APPELLATE REPORTS
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

in fact and had shown that the man's assets would be wasted or dissipated unless a conservator were appointed. *Id*. The court explained that an attorney in fact is obligated to act solely for the benefit of the principal and agreed with the trial court's finding that given the daughter and son-in-law's self-dealing, a conservatorship was necessary despite the existence of the power of attorney. *Id.* The court also upheld the finding that it was in the man's best interests to pass over the daughter and son-in-law when appointing a conservator, despite their statutory priority for appointment. *Id.*

Although Cheryl might not have made gifts to herself from Lorine's estate, the same result that was reached in *In re Conservatorship of Anderson* is warranted here. The durable power of attorney for asset management executed by Lorine in March 2006 became effective immediately. The GAL indicated that Cheryl did not understand her fiduciary duties as Lorine's attorney in fact, and Cheryl's actions confirm this. Cheryl was first listed on Lorine's bank account in September 2011 and began signing checks out of the account shortly thereafter. A number of checks written to "'Cash'" were unexplained. According to Margo, in 1 month, Cheryl wrote $2,000 in checks to a grocery store; Cheryl also wrote checks for car insurance after Lorine was unable to drive and checks for groceries and for discount store purchases after Lorine was admitted to Mory's Haven. All of these expenses, while not necessarily gifts to Cheryl from Lorine's estate, raise questions about Cheryl's ability to act solely for Lorine's benefit when managing Lorine's property.

More significant, however, is what Cheryl failed to do with Lorine's property while acting as her attorney in fact. During the time Cheryl was acting under the power of attorney for asset management, Lorine's property taxes became delinquent, the resulting tax liens were sold, and the purchasers of the tax liens instituted five foreclosure cases in Platte County against Lorine's properties. When asked about the delinquent taxes, Cheryl testified that they had resulted from "[l]iving expenses

- 456 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

and trying to make it day-to-day." She further testified that she had not been "making good choices" and that she was "trying to learn from those experiences and make good choices." In essence, rather than ensure that Lorine's assets were used to fund her care and support, Cheryl risked losing Lorine's property in foreclosure actions by failing to see to it that Lorine's property taxes were paid.

Based on the foregoing, the county court's finding that Lorine's property would be wasted or dissipated unless proper management were provided was supported by competent evidence, as was its finding that it was in Lorine's best interests to pass over Cheryl despite her statutory priority for appointment.

*Appointment of Neutral Third Party.*

Cheryl's fifth assignment of error is that the county court should have passed over Margo and appointed a neutral third party as guardian and conservator. Cheryl's only argument in support of this assignment is that the GAL "was certainly correct in her judgment" when she recommended that a neutral party be appointed guardian and conservator due to the potential for family disputes. Brief for appellant at 24.

As noted above, in appointing a guardian or conservator, a court may bypass a person with priority and appoint a person with lower or no priority, if it is in the protected person's best interest. §§ 30-2627(c) and 30-2639(c). Other than some animosity between Margo and Cheryl, however, there was nothing indicating that it was in Lorine's best interests to pass over Margo and appoint a neutral third party as guardian and conservator. Bougger testified that when Margo was at Mory's Haven, Lorine was content and peaceful, and Bougger described Margo as open, conscientious, and appropriately concerned about Lorine's care. Similarly, Groteluschen testified that Margo was very caring with Lorine. Once Margo was appointed temporary guardian and conservator, she quickly began taking steps to properly manage Lorine's property,

- 457 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

including securing insurance policies for her properties. Margo had experience in managing assets and making financial decisions by virtue of running her own business in Wichita for 30 years, which business was in good standing and had not had any tax liens or judgments rendered against it. The court's decision to appoint Margo, rather than a neutral third party, as guardian and conservator was supported by competent evidence.

*Authority to Sell Mue-Cow Property.*

Cheryl's sixth assignment of error is that the county court erred in authorizing Margo to sell the Mue-Cow property. Cheryl contends that by authorizing the sale, the court failed to take into account Lorine's will, in which she specifically devised the property to Cheryl. Cheryl also argues that she is a minority shareholder in Mue-Cow, such that the court's order essentially authorized Margo to sell property that did not solely belong to Lorine.

Cheryl's argument concerning Lorine's will is based on Neb. Rev. Stat. § 30-2656 (Reissue 2008), which provides that in selecting the assets of the estate for distribution and utilizing the powers of revocation or withdrawal available for the support of the protected person, a conservator and the court "should take into account any known estate plan of the protected person, including his will." The Uniform Probate Code contains a nearly identical provision, the comment to which explains that "by allowing the conservator access to the estate plan, the risk of inadvertent sales of specifically devised property and the difficult ademption problems such sales often create may be avoided." Unif. Probate Code § 5-418, comment, 8 (part III) U.L.A. at 109 (2013).

[11,12] A specific devise is a provision in a will that passes a particular piece of property. See Black's Law Dictionary 547 (10th ed. 2014). When specifically devised property ceases to be part of the estate at the time of the testator's death, "ademption" occurs. See *In re Estate of Bauer*, 270 Neb.

- 458 -

Decisions of the Nebraska Court of Appeals
23 Nebraska Appellate Reports
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

91, 95, 700 N.W.2d 572, 577 (2005). One type of ademp-
tion, called "ademption by implied revocation," occurs when
specifically devised property is sold during the testator's life-
time. *Id*. This type of ademption is "'"based upon a presumed
alteration of intention arising from the changed condition and
circumstances of the testator, or on the presumption that the
will would have been different had it been executed under the
altered circumstances."'" *Id*. at 95-96, 700 N.W.2d at 577,
quoting *In re Estate of Poach*, 257 Neb. 663, 600 N.W.2d
172 (1999).

[13] In Nebraska, the common-law doctrine of ademption
has been modified by statute under certain circumstances.
*In re Estate of Bauer, supra.* Pertinent here, Neb. Rev. Stat.
§ 30-2346(a) (Reissue 2008) provides that "[i]f specifically
devised property is sold by a conservator or guardian . . . the
specific devisee has the right to a general pecuniary devise
equal to the net sale price." In other words, when a conser-
vator or guardian, not the testator, sells specifically devised
property during the testator's lifetime, no ademption occurs.
The proceeds of the sale are not included in the testator's
residuary estate, but, rather, are given to the specific devi-
see to honor the specific devise. As applied here, § 30-2346
means that even if Margo were to sell the Mue-Cow prop-
erty during Lorine's lifetime, Cheryl would still receive the
net sale price of the property as her specific devise upon
Lorine's death, assuming that sufficient funds remained in
Lorine's estate.

The rationale underlying § 30-2346 is apparent. When a
conservator or guardian sells specifically devised property, the
presumption that a testator's intent has changed, or that the
will would have been different under the altered circumstances,
does not apply. As one court explained when addressing the
effect of a conservator's sale of specifically devised property,
"[t]o allow the sale of . . . various articles of personal property
to work an ademption would be to give the court powers to
alter and amend the Will of the testatrix and thereby defeat her

- 459 -

DECISIONS OF THE NEBRASKA COURT OF APPEALS
23 NEBRASKA APPELLATE REPORTS
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

testamentary intent." *Will of Clark*, 90 Misc. 2d 925, 930, 396 N.Y.S.2d 593, 596 (N.Y. Sur. Ct. 1977).

[14,15] Understanding § 30-2346 and its rationale helps to inform our analysis of what it means for a conservator and the court to fulfil their duty pursuant to § 30-2656 to "take into account any known estate plan of the protected person." By enacting § 30-2346, the Legislature provided protection to specific devises in the estate plans of incapacitated persons subject to guardianships and conservatorships. Given the heightened protection that specific devises receive by statute, it would seem that a conservator taking into account a protected person's "known estate plan" should invade specifically devised property as a last resort, and only when doing so is clearly necessary for the protected person's care and support. See § 30-2656. Where, as here, there is ample property in a protected person's estate that can be sold to adequately fund the protected person's care without invading specifically devised property, the conservator and the court should not sell the specifically devised property unless circumstances clearly establish that it is in the protected person's best interests to do so. See *In re Guardianship & Conservatorship of Garcia*, 262 Neb. 205, 631 N.W.2d 464 (2001) (describing standard for assessing conservator's exercise of power as whether there is clear and convincing evidence that conservator's actions are in best interests of protected person).

Applying these principles here, we conclude that it was error for the county court to authorize Margo to sell the Mue-Cow property. At the time of the hearing on Margo's "Motion for Authority to Act," the court had before it the estimated values of Lorine's property, which included the Mue-Cow property, valued at $110,795; the adjoining 99-acre parcel, valued at $489,535; the adjoining 48-acre parcel, valued at $67,910; the rental home in Columbus, valued at $60,000; and the Wagner Lakes cabin, valued at $46,000. Lorine's recurring monthly expenses at her nursing facility totaled $6,275, which meant that selling the 99-acre parcel, the 48-acre parcel, and

the rental home in Columbus for a total of $617,445 would have funded Lorine's care for 98 months, or over 8 years. Neither the 99-acre parcel, the 48-acre parcel, nor the rental home in Columbus was specifically devised in Lorine's will, which meant that selling them would have had little to no effect on her estate plan. In short, there was ample property in Lorine's estate that could have been sold to adequately fund Lorine's care for a number of years without invading specifically devised property.

Furthermore, Margo and Gary did not establish by clear and convincing evidence that despite the ample assets available for Lorine's care, it was in Lorine's best interests to sell the specifically devised property. The evidence that the county court relied upon in authorizing the sale of the Mue-Cow property was Grubaugh's testimony that selling all of the properties together would generate the highest sales prices. However, upon questioning by the court, Grubaugh admitted that he was "guessing" it would be advantageous to sell the tracts together and that excluding the Mue-Cow property from the sale may not have any effect on the sales prices of the other properties. Even assuming that it would have had some effect, the benefit of selling the properties together had to be balanced against the goal of protecting Lorine's estate plan. Given the significant values of Lorine's properties that were not specifically devised in her will, any marginal benefit that may have been realized by selling all of the properties together did not justify invading the specifically devised property, especially given Grubaugh's equivocal testimony. While Lorine's circumstances may very well change in the future, rendering it necessary to sell the Mue-Cow property, those circumstances did not exist at the time of the hearing. We also note that although Margo testified that the Mue-Cow property was a "strain" on Lorine's estate, Cheryl testified to her willingness to pay all of the Mue-Cow property's expenses while she lived on the property, which would eliminate any financial drain.

- 461 -

DECISIONS OF THE NEBRASKA COURT OF APPEALS
23 NEBRASKA APPELLATE REPORTS
IN RE GUARDIANSHIP & CONSERVATORSHIP OF MUELLER
Cite as 23 Neb. App. 430

Because we have concluded that the county court erred in authorizing Margo to sell the Mue-Cow property, we need not address Cheryl's argument concerning her alleged minority ownership of Mue-Cow. See *Hall v. County of Lancaster*, 287 Neb. 969, 846 N.W.2d 107 (2014) (appellate court is not obligated to engage in analysis which is not needed to adjudicate case and controversy before it). For the reasons stated, we reverse the October 23, 2014, order insofar as it authorized Margo to sell the Mue-Cow property.

## CONCLUSION

For the reasons explained above, we affirm the order appointing Margo guardian and conservator for Lorine in case No. A-14-780 and reverse the order in case No. A-14-971 insofar as it authorized Margo to sell the Mue-Cow property; because Cheryl did not challenge any other aspect of the order in case No. A-14-971, we affirm the remainder of the order.

JUDGMENT IN NO. A-14-780 AFFIRMED.
JUDGMENT IN NO. A-14-971 AFFIRMED IN PART,
AND IN PART REVERSED.